# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-285

**NELDA SMITH, ET AL.**

**VERSUS**

**ST. PAUL FIRE AND MARINE INSURANCE CO., ET AL.**

\*\*\*\*\*\*\*\*\*\*

**APPEAL FROM THE**
**FOURTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF CALCASIEU, DOCKET NO. 2001-1326**
**HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE**

\*\*\*\*\*\*\*\*\*\*

**JAMES T. GENOVESE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and James T. Genovese, Judges.

**AFFIRMED.**


**Todd A. Townsley**
**The Townsley Law Firm**
**3102 Enterprise Boulevard**
**Lake Charles, Louisiana 70601**
**(337) 478-1400**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Nelda Smith, et al.**


**Edmund M. Thomas**
**6104 Line Avenue, Suite 4**
**Shreveport, Louisiana 71106**
**(337) 219-9888**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Nelda Smith, et al.**

**James R. Shelton**
**Ryan M. Goudelocke**
**Durio, McGoffin, Stagg & Ackermann**
**220 Heymann Boulevard**
**Post Office Box 51308**
**Lafayette, Louisiana 70505-1308**
**(337) 233-0300**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **St. Paul Fire & Marine Insurance Company**
    **and Dr. Brian Gamborg**

**GENOVESE, Judge.**

Plaintiffs, Nelda Smith, Cathy Breaux, Wilburn G. Smith, and Gordon Smith, appeal an adverse verdict following a jury trial on their medical malpractice claim against Defendant, Dr. Brian Gamborg (Dr. Gamborg). Plaintiffs also appeal the trial judge's refusal to give a certain jury instruction. For the following reasons, we affirm.

## STATEMENT OF THE CASE

On January 7, 1999, Dr. Gamborg, a family practitioner, treated Mr. Wilburn Smith (Mr. Smith) for sinus congestion progressing into chest congestion with an unproductive cough and shortness of breath on exertion. Mr. Smith was diagnosed by Dr. Gamborg as having acute bronchitis and acute exacerbation of chronic obstructive pulmonary disease (COPD), for which Dr. Gamborg prescribed an antibiotic and steriodal breathing aids. At his home that night, Mr. Smith began having extreme difficulty breathing and asked his wife to get help. Mrs. Smith immediately called 911 and her son, Wilburn G. Smith. Shortly after the arrival of emergency personnel, Mr. Smith suffered cardiopulmonary arrest. Mr. Smith was then transported by ambulance to DeQuincy Memorial Hospital where efforts to resuscitate him were unsuccessful, and he expired.

Mr. Smith's surviving spouse, Nelda Smith (Mrs. Smith), and three children, Cathy Breaux, Wilburn G. Smith, and Gordon Smith, Plaintiffs herein, filed a complaint of medical malpractice against Dr. Gamborg with the Louisiana Patients' Compensation Fund. On December 12, 2000, a medical review panel unanimously determined that Dr. Gamborg met the applicable standard of care in his treatment of Mr. Smith. Thereafter, on March 9, 2001, Plaintiffs instituted the present wrongful

1

death and survival action against Dr. Gamborg and his medical malpractice insurer, St. Paul Fire and Marine Insurance Company (St. Paul). A jury trial was held from September 25, 2006 through September 29, 2006, wherein the jury returned a verdict in favor of Dr. Gamborg. The jury found that Plaintiffs failed to satisfy their evidentiary burden of proving that Dr. Gamborg breached the requisite standard of care. Judgment in accordance with the jury verdict was signed by the trial court on October 31, 2006. Plaintiffs appeal.

## ISSUES

Plaintiffs assert that the trial judge erred when he denied their request to include a jury charge regarding "a special standard of care that applies when a patient presents to his primary care doctor with a life-threatening condition in the differential diagnosis." Plaintiffs also argue that the jury erred in finding that Plaintiffs failed to establish by a preponderance of the evidence that Dr. Gamborg breached the standard of care in his treatment of Mr. Smith.

## LAW

### *Standard of Review*

The determination of whether Dr. Gamborg breached the standard of care is a factual determination which is subject to the manifest error standard of appellate review; consequently, a court of appeal may not set aside a trial court's or jury's finding unless it is manifestly erroneous or clearly wrong. *Greer v. State, Through Dep't of Transp. & Dev.*, 06-417 (La.App. 3 Cir. 10/4/06), 941 So.2d 141, *writ denied*, 06-2650 (La. 1/8/07), 948 So.2d 128.

> In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and meet the following two-part test: (1) find that a reasonable factual basis does not exist for the finding; and (2) further determine that the record establishes that the fact

2

finder is clearly wrong or manifestly erroneous. *Stobart v. State, Through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993).

*Id.* at 145.

### *Burden of Proof*

Plaintiffs in a malpractice action based upon the negligence of a physician must establish their claim by a preponderance of the evidence. *See* La.R.S. 9:2794(C). Louisiana Revised Statutes 9:2794(A) provides that the plaintiff shall prove:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

### DISCUSSION

Plaintiffs, pursuant to La.R.S. 9:2794 and the jurisprudence interpreting said statute, had the burden of proving, by a preponderance of the evidence, the following: (1) the standard of care for treating a patient such as Mr. Smith; (2) that Dr. Gamborg breached that standard of care; and (3) that the breach caused Mr. Smith's death. *See also Browning v. West Calcasieu Cameron Hosp.*, 03-332 (La.App. 3 Cir. 11/12/03), 865 So.2d 795, *writ denied*, 03-3354 (La. 2/13/04), 867 So.2d 691.

3

### *Jury Instruction*

Plaintiffs contend that the trial judge committed reversible error by not instructing the jury on the "special standard of care that applies when a patient presents to his primary care doctor with a life-threatening condition in the differential diagnosis"; therefore, they contend that the jury was not properly instructed as to the standard of care. Plaintiffs offered evidence that Mr. Smith was a patient of Dr. Gamborg's with a history of having a heart attack in 1978. Mr. Smith had ischemic coronary artery disease, or impending heart attack, and was on heart medication. On January 7, 1999, Mr. Smith presented to Dr. Gamborg with symptoms of significant dyspensia, or shortness of breath on exertion, and an exercise tolerance of 100 yards. Plaintiffs argue that based on these factors, it was incumbent upon Dr. Gamborg to place ischemic coronary artery disease in his differential diagnosis, and that once it was in his differential diagnosis, Dr. Gamborg had a duty to perform the necessary tests to determine whether or not Mr. Smith was in imminent danger of having a life-threatening cardiac event. Plaintiffs argue that Dr. Gamborg's examination of Mr. Smith was grossly and negligently insufficient and that Dr. Gamborg breached the standard of care in his treatment of Mr. Smith.

Dr. Rick Matis (Dr. Matis) was called to testify by Dr. Gamborg. Dr. Matis explained a differential diagnosis as "a shopping list of things that could be" from which "you try to come to an idea of what your best course for allowing that person to improve with whatever it is they have."

Louisiana Code of Civil Procedure Article 1791 states, "The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of the

4

witness, or giving an opinion as to what has been proved, not proved, or refuted."

In denying Plaintiffs' requested jury instruction, the trial judge declared that "[t]he court in presenting the instructions to the jury is bound to merely give the members of the jury the current, correct status of the law and is not allowed to make comments on the evidence as required by law." We agree. To give Plaintiffs' suggested jury instruction would have required the trial judge to make certain factual determinations, which invades the province of the jury, and is tantamount to commenting on the evidence, which is prohibited by La.Code Civ.P. art. 1791.

Plaintiffs have the burden of proving the requisite standard of care. La.R.S. 9:2794(A); *Browning*, 865 So.2d 795. The jury determines what to accept as fact. The standard of care is a factual question answered by the jury based on the evidence. Thus, we find no error in the trial judge's refusal to adopt the Plaintiffs's proposed jury instruction.

***Jury's Verdict***

The record reflects that around 4:00 p.m. on January 7, 1999, Mr. Smith reported to the office of Dr. Gamborg, his family physician, with complaints of sinus and chest congestion and shortness of breath on exertion. Mr. Smith's pulse was 72, his respiration rate was 18, and his oxygen saturation was 96 percent.

Plaintiffs allege that Mr. Smith died due to the breach of the standard of care by Dr. Gamborg in failing to adequately assess and/or treat Mr. Smith's cardiac condition. Plaintiffs petition for damages states:

> Dr. Gamborg did not perform the appropriate diagnostic evaluations nor did he document thoroughly enough [Mr. Smith]'s history, physical examination, responses to therapy, and results of diagnostic tests, he did not have the proper tools to make the determination as to whether or not [Mr. Smith] should have been admitted [to the hospital].

5

Plaintiffs assert that Mr. Smith died of a heart attack[1] on the evening of January 7, 1999. Plaintiffs contend that when Mr. Smith visited Dr. Gamborg earlier on the afternoon of January 7, 1999, Mr. Smith should have been assessed for possibly having a life-threatening cardiac problem because he had suffered a heart attack in 1978, he was complaining of shortness of breath on exertion, and Mrs. Smith had recently requested a prescription for nitroglycerin on behalf of Mr. Smith. Therefore, Plaintiffs argue that Dr. Gamborg should have more thoroughly explored the possibility that Mr. Smith was having another heart attack instead of diagnosing and treating Mr. Smith for exacerbation of bronchitis and COPD. Plaintiffs further contend that Dr. Gamborg's negligent misdiagnosis of Mr. Smith proved to be fatal.

Plaintiffs testified that Mr. Smith had been breathing heavily for a couple of days prior to his doctor's visit. Mrs. Smith testified that at Mr. Smith's request, she called Dr. Gamborg's office on January 5, 1999 to request a prescription for nitroglycerin, and she had the prescription filled that same day. Both Mrs. Smith and Wilburn G. Smith, Mr. Smith's son, testified that after Mr. Smith's death, there were only 20 nitroglycerin pills remaining in the bottle which originally contained 25 pills.

Mr. Arthur Tidwell, Mr. Smith's boss, testified that he suggested that Mr. Smith see a doctor since he was obviously feeling badly. Mr. Smith's daughter, Cathy Breaux, testified that her father was having difficulty breathing on the evening of January 7, 1999.

To support their contention that Dr. Gamborg's failure to thoroughly evaluate Mr. Smith caused his demise, Plaintiffs offered into evidence the testimony of Dr.

---

[1]This court notes that the actual cause of death remains unknown because no autopsy was performed on Mr. Smith; however, the parties generally agreed that an acute myocardial infarction was more probable than not the cause of Mr. Smith's death.

Michael Sills (Dr. Sills) and Dr. John Buckingham (Dr. Buckingham). Dr. Sills, an expert in the fields of both internal medicine and cardiology, testified that Mr. Smith's 1978 heart attack made him an at risk cardiac patient who needed close monitoring by Dr. Gamborg. Dr. Sills also opined that Mr. Smith would have had an 80 percent chance of survival if Dr. Gamborg would have sent him to the hospital on January 7, 1999.

Dr. Buckingham, an expert in the field of family practice, agreed with Dr. Sills opinion that Mr. Smith would have had an 80 to 90 percent chance of survival if he had been admitted to the hospital. According to Dr. Buckingham, neither the results of Mr. Smith's physical exam nor his vital signs should have caused Dr. Gamborg to rule out the existence of an imminent life-threatening cardiac problem. He also testified that approving a nitroglycerin refill is below the standard of care.

Dr. Michael Seep (Dr. Seep), an expert in the field of family practice, served as a member of the medical review panel that exonerated Dr. Gamborg. Called by the defense to testify, Dr. Seep stated that he reviewed Dr. Gamborg's medical records and did not support Plaintiffs' allegations that Dr. Gamborg was required to rule out any and all life-threatening causes in his differential diagnosis. Dr. Seep testified that "it would become physically impossible to practice medicine in a family practice setting because you would have so many patients that you would have to send to rule out this and that. You can't do that." Dr. Seep elaborated that a differential diagnosis is used to "mentally hone down what in your mind is the cause of these problems . . . ." Finally, he opined that there was "no evidence to suggest that [Mr. Smith was] having a cardiac problem."

According to the opinion rendered by the medical review panel, the physical

7

examination performed on Mr. Smith showed no signs of an acute pulmonary or cardiac event. Finding no need for any other diagnostic testing other than the physical examination that was performed by Dr. Gamborg, the panel opined that "the treatment provided was appropriate in light of the history and physical presented." Further, the medical review panel noted that "the jugular venous pressure was recorded as normal, again diminishing the suggestion of an acute pulmonary or cardiac event."

Dr. Gamborg's testimony and medical records reveal that Mr. Smith's visits to Dr. Gamborg's office began on March 18, 1997, when Mr. Smith needed an exam required for health insurance. On June 9, 1997, Mr. Smith was treated by Dr. Gamborg for upper respiratory symptoms that had progressed into chest congestion and shortness of breath. An X-ray showed chronic obstructive pulmonary disease. Mr. Smith returned to Dr. Gamborg's office on October 31, 1997 with symptoms of sinus congestion and sore throat for which antibiotics were prescribed. Mr. Smith saw Dr. Gamborg on December 19, 1997 for prostatitis, and again on March 2, 1998 for dermatitis.

According to Dr. Gamborg, when he saw Mr. Smith on January 7, 1999, Mr. Smith again complained of sinus congestion progressing into chest congestion with an unproductive cough and shortness of breath. Dr. Gamborg had no recollection nor is there any indication on Dr. Gamborg's medical chart that Mr. Smith complained of having any chest pain. However, what is documented is Mr. Smith's report of having rectal bleeding.

Dr. Gamborg testified that he did construct a mental list, or a differential diagnosis, of the many problems possibly causing Mr. Smith's symptoms. According

8

to Dr. Gamborg, he ruled out pulmonary embolus because of the absence of chest pain and a healthy blood-oxygen saturation. Likewise, influenza was ruled out due to the lack of chills and headache. Dr. Gamborg testified that because of Mr. Smith's physical examination and the symptoms of gradually worsening upper respiratory congestion leading to chest congestion and shortness of breath only on exertion and not at rest, he believed it was unlikely that Mr. Smith was suffering from an acute coronary condition. Mr. Smith was diagnosed by Dr. Gamborg as having acute bronchitis and acute exacerbation of COPD. Dr. Gamborg testified that based on his records and his standard practice procedures, he was confident that Mr. Smith was not having any chest pain or pressure during his January 7, 1999 visit to Dr. Gamborg.

"Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong." *Davis v. ENSCO Offshore Co.*, 06-197, p.1 (La.App. 3 Cir. 5/31/06), 931 So.2d 1194, 1195 (citations omitted). Based on our thorough review of the record, there are two permissible views of the evidence as exhibited by the conflicting expert testimony; therefore, we cannot say that the jury was manifestly erroneous or clearly wrong in determining that the Plaintiffs failed to satisfy their evidentiary burden of proving that Dr. Gamborg breached the requisite standard of care.

## DECREE

For the foregoing reasons, the jury's verdict in favor of Defendant, Dr. Brian Gamborg, is affirmed. Costs of this appeal are assessed against Plaintiffs/Appellants, Nelda Smith, Cathy Breaux, Wilburn G. Smith, and Gordon Smith.

**AFFIRMED.**